**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAROL KING,<br><br>                    PLAINTIFF,<br>      V.<br><br>GENERAL ATLANTIC SERVICE COMPANY, L.P.,<br>GENERAL ATLANTIC SERVICE COMPANY SUBCO, LLC,<br>GENERAL ATLANTIC PARTNERS, L.P.,<br>TAYLOR MCCARTHY, in her personal and professional capacities,<br>MARY ARMSTRONG, in her personal and professional capacities, and<br>ELEANOR BOONE, in her personal and professional capacities.<br><br>                    DEFENDANTS. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Carol King, represented by Seppinni Law, alleges based on information and belief at all relevant times:

### INTRODUCTION

1. General Atlantic markets itself as a premier global investment firm built on partnership and a vision to "improve the human condition."[1] But for Plaintiff Carol King, a Senior Associate and Graphic Designer, the reality of working at General Atlantic as a nursing mother was anything but humanizing.

2. Defendants denied Ms. King an adequate space to express breast milk after giving birth, forcing her to book general purpose "wellness rooms." For weeks, Ms. King would try to access the rooms, only to have colleagues, often men, keep the spaces past their allotted bookings, leaving Ms. King to wait in pain in the hallway, pumping equipment in hand.

---

[1] See https://www.generalatlantic.com/our-story/ (last visited April 17, 2026).

1

3.      Though Ms. King complained about this mistreatment, Defendants did nothing to remedy their legal violations, forcing Ms. King to pump at her desk. Rather than apologize to Ms. King, Defendants reprimanded her, saying she needed to stop pumping at work because it caused "discomfort" for her coworkers, never mind the discomfort Ms. King felt as a new breastfeeding mother with no space to pump at work. Bizarrely, Defendants then criticized her for taking too much food from catered lunches.

4.      Not content to humiliate her, Defendants then ignored her protected request for a modest work from home schedule to take care of her children, even while they permitted her male colleague to work exclusively from home. Finally, mere days after Ms. King again complained about the lack of a private pumping space and requested protected accommodations and leave, Defendants fired her.

5.      Accordingly, Ms. King asserts causes of action under the Fair Labor Standards Act, as amended by the Providing Urgent Maternal Protections for Nursing Mothers Act (FLSA PUMP Act), New York City Human Rights Law (NYCHRL), New York State Human Rights Law (NYSHRL), and New York Labor Law (NYLL) to hold General Atlantic accountable for its discriminatory and retaliatory misconduct.

## JURISDICTION AND VENUE

6.      The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 pursuant to Plaintiff's claims under federal law.

7.      The Court has supplemental jurisdiction over Plaintiff's state and local law claims under 28 U.S.C. § 1367(a). Plaintiff's state and local law claims derive from the same common nucleus of operative fact as the federal claims and form part of the same case or controversy.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants are headquartered in this District and a substantial part of the events or omissions giving rise to the claims, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PROCEDURES

9.      To comply with New York City Administrative Code § 8-502(c), Plaintiff will serve a copy of this Complaint on the New York City Commission on Human Rights and the Corporation Counsel of the City of New York within 10 days of filing this action.

10.     To comply with New York Labor Law § 215(2)(b), Plaintiff will serve notice of this action upon the Attorney General of the State of New York at or before the commencement of this action.

## THE PARTIES

11.     Plaintiff Carol King is a citizen of New York. From January 13, 2025 to December 31, 2025, Defendants employed Plaintiff. At all relevant times, Plaintiff was an "employee" within the meaning of all relevant statutes.

12.     Defendant General Atlantic Service Company, L.P. is a Delaware corporation with its principal place of business located at 55 East 52nd Street, New York, NY 10055. At all relevant times, General Atlantic was Plaintiff's "employer" within the meaning of all relevant statutes. General Atlantic directed, controlled, and compensated Plaintiff's work. At all relevant times, General Atlantic was an enterprise engaged in interstate commerce or in the production of goods for commerce and had an annual gross volume of sales made or business done of not less than $500,000.

13.     Defendant General Atlantic Service Company SubCo, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business at 1521 Concord Pike, Suite 201, Wilmington, DE 19803. At all relevant times, GASC SubCo, LLC was Plaintiff's "employer" within the meaning of all relevant statutes. At all relevant times, GASC SubCo, LLC was an enterprise engaged in interstate commerce or in the production of goods for commerce and had an annual gross volume of sales made or business done of not less than $500,000.

14.     Defendant General Atlantic Partners, L.P. is a Delaware corporation with its principal place of business located at 1521 Concord Pike, Suite 201, Wilmington, DE 19803. At all relevant times, General Atlantic was Plaintiff's "employer" within the meaning of all relevant statutes. General Atlantic directed, controlled, and compensated Plaintiff's work. At all relevant times, General Atlantic was an enterprise engaged in interstate commerce or in the production of goods for commerce and had an annual gross volume of sales made or business done of not less than $500,000.

15.     Defendant Taylor McCarthy is a citizen of New York. During the relevant period, Taylor McCarthy was the Vice President and HR Business Partner for Business Operations and

Administration Partner at General Atlantic. Defendant McCarthy exercised active operational control over the company, possessed the power to hire and fire Plaintiff, supervised Plaintiff's work schedules and conditions of employment, and determined Plaintiff's rate and method of pay. Accordingly, Taylor McCarthy is an "employer" subject to individual liability under the relevant laws.

16.     Defendant Mary Armstrong is a citizen of New York. During the relevant period, Mary Armstrong was the Managing Director of Marketing and Communications of General Atlantic. Defendant Armstrong exercised active operational control over the company, possessed the power to hire and fire Plaintiff, supervised Plaintiff's work schedules and conditions of employment, and determined Plaintiff's rate and method of pay. Accordingly, Mary Armstrong is an "employer" subject to individual liability under the relevant laws.

17.     Defendant Eleanor Boone is a citizen of New York. During the relevant period, Eleanor Boone was the Vice President of Real Estate and Workplace Experience of General Atlantic. Defendant Boone exercised active operational control over the company, possessed the power to hire and fire Plaintiff, supervised Plaintiff's work schedules and conditions of employment, and determined Plaintiff's rate and method of pay. Accordingly, Eleanor Boone is an "employer" subject to individual liability under the relevant laws.

## THE FACTS

### 1.    Ms. King's Employment with General Atlantic

18.    Ms. King started working as a Senior Associate Graphic Designer, on the Marketing and Communications team at General Atlantic in New York City on January 13, 2025.

19.    Ms. King brought twenty-five years of experience to General Atlantic.

20.    Ms. King was about six and a half months pregnant with her second child when she started at General Atlantic.

21.    After her child was born on April 1, 2025, she took short term disability maternity leave from about April 2, 2025 to June 30, 2025.

22.    Ms. King reported to Mary Armstrong, Managing Director of Marketing and Communications.

23.    Ms. King put her extensive experience to good use, and Ms. Armstrong appreciated it.

24.    Ms. King, for example, regularly wrote to Ms. Armstrong with ideas to improve collaboration among team members and ensure that the workflow was smooth; she raised discussion topics with Ms. Armstrong; demonstrated leadership in meetings; and provided new perspectives on how to approach projects.

25.    Ms. Armstrong regularly responded to Ms. King's emails with appreciation for Ms. King's thought processes, ideas, and approach to work.

26.    Ms. Armstrong told Ms. King that she "love[d]" her ideas, to "keep it up," and expressed gratitude for Ms. King's leadership in meetings and with her team.

27.    While Ms. King was working hard to ensure General Atlantic's success, General Atlantic did not respond in kind.

7

**2.     Ms. King Attempts to Access General Atlantic's "Wellness Rooms" to Pump**

28.     Ms. King needed a space to pump breast milk throughout the day after returning from maternity leave.

29.     Defendants did not provide a dedicated space for nursing mothers.

30.     Instead, they offered "wellness rooms" on the 16th and 17th floors.

31.     These wellness rooms were multi-purpose spaces for the entire staff.

32.     Ms. King's office was on the 16th floor.

33.     Employees—including men—used these wellness rooms for private phone calls, work, and meetings.

34.     When Ms. King first tried using the multipurpose rooms, they lacked functional locks, which Ms. King reported to Defendants.

35.     Because the rooms were multipurpose rather than primarily reserved for lactation, Ms. King was forced to use a restrictive reservation system, open to all employees without preference for lactation purposes, that capped her access at 30-minute increments.

36.     Ms. King competed with other employees at the company for these 30-minute reservations, which usually booked out ahead of time. Often, employees ignored the reservation system and would camp out in the wellness rooms during Ms. King's scheduled time.

37.     The multipurpose wellness room was treated like just another meeting space at the company.

38.     The rooms contained only a reclining chair and lacked a proper desk.

39.     This kept Ms. King from using her laptop or working while she pumped.

40.     Despite these barriers, Ms. King consistently followed the reservation system. When Ms. King found employees in the wellness room during her reservations, she asked the employees to honor her reservation so she could pump. They met her with resistance.

41. Ms. King waited patiently in the hallway in pain, holding her pumping equipment until employees without any lactation needs eventually vacated the space.

42. This friction persisted because the rooms lacked signage explaining the reservation requirements, and did not state that priority went to breastfeeding mothers or that the room's primary purpose was for breast feeding and pumping.

43. On August 11, 2025, Ms. King made a protected complaint through the Workplace Experience team, asking if the sign in front of the room could make the reservation requirements clear so she did not have to knock or ask people to leave the room during her reservations.

44. Though a sign went up, the company did nothing to enforce Ms. King's access to the room.

45. Ms. King still found the wellness rooms occupied during her reserved times.

46. As a full-time employee caring for both a newborn and another child, she struggled with the stress and anxiety of navigating Defendants' arduous reservation system—an ordeal worsened by colleagues who ignored her bookings.

47. Defendants expected Ms. King to maintain more than a full-time workload and schedule her day around pumping yet forced her to wait in the hallway with her equipment while others occupied the room.

48. At one point, Defendants suggested that if other employees were occupying the wellness room on the 16th floor for non-lactation reasons, then Ms. King should use the 17th-floor room instead; however, booking that room at the last minute when she already had reserved space on her floor, then hauling her equipment to another floor that suffered from the same problems was not a reasonable solution to the problems created by Defendants' deficient lactation room and policies.

49. Because Defendants ignored her needs and their legal obligations, Ms. King had to pump discreetly at her desk to alleviate and prevent the pain and serious medical complications that accompany delayed pumping.

50. The office's open-cubicle layout offered Ms. King no privacy, yet she had no other choice.

51. Ms. King remained fully clothed (and compliant with all company policies) while pumping at her desk, as modern wearable lactation pumps are designed to enable.

### 3. General Atlantic Admonishes Ms. King for Pumping at Work and Caring for Her Family Outside of Work Hours

52. Ms. King worked diligently despite the obstacles to pumping at General Atlantic.

53. Consistent with how General Atlantic ignored Ms. King's lactation accommodation needs, Defendants also penalized Ms. King for her status as a parent and caretaker.

54. In October 2025, Ms. Armstrong suddenly demanded that Ms. King have a formal meeting with Human Resources to discuss performance and availability.

55. On October 23, 2025, per Ms. Armstrong's directions, Ms. King met with Taylor McCarthy from Human Resources.

56. But the meeting had nothing to do with Ms. King's performance or availability.

57. Instead, Ms. McCarthy criticized Ms. King for pumping at her desk and eating too many office snacks.

58. Ms. King again explained that she was a breastfeeding mother trying to navigate General Atlantic's deficient facilities as well as the hostility she repeatedly faced when asking others to vacate the rooms on the 16th and 17th floors.

59. On October 28, 2025, Ms. McCarthy emailed a summary of the meeting.

60.     **Defendants admonished Ms. King for pumping at work, noting "concerns re-garding pumping at [her] desk" and noted that Ms. King's pumping "made other employees uncomfortable":**

> We also discussed concerns regarding pumping at your desk. In addition, since our conversation, it was brought to our attention that you were pumping in a shared office space that is not intended for that purpose. This area is a common space with no privacy, and the activity made other employees uncomfortable. As mentioned, please use the designated nursing rooms on the 16th and 17th floors, which are equipped for your comfort and privacy. If those rooms are occupied or you need assistance, please reach out to me or Workplace Experience.
>
> Please don't hesitate to reach out if you have any questions or would like to discuss further.
>
> Best,
> Taylor

61.     Ms. King was stunned.

62.     This was the first time she was told that her discreet pumping made others uncomfortable.

63.     Moreover, she had only resorted to pumping at her desk—the "common space with no privacy"—because Defendants failed to provide her reliable access to the wellness rooms.

64.     On October 28, 2025, after receiving Ms. McCarthy's email, Ms. King made another protected complaint to Ms. McCarthy and Ms. Boone through Workplace Experience, noting that someone else was using the wellness room during her reserved time *again*.

65.     Ms. King also asked for clarification on whether the room was primarily intended for nursing purposes—and if it was, for that to be made clear to other employees.

66.     Ms. Boone replied that it was not; instead, the room's primary purpose was a shared space to accommodate "prayer and other wellness needs."

67. Defendants' hostility did not stop there.

68. In email exchanges between October 28, 2025 and October 29, 2025, Ms. McCarthy reprimanded Ms. King for taking leftover office food even though other employees did the same.

69. The office typically provided lunch.

70. Because leftovers were abundant, employees commonly took food home—some even joked about "taking leftovers home for dinner."

71. Ms. King occasionally took leftovers home or saved the remainder of a lunch she could not finish.

72. Ms. King informed someone in the Human Resources department that as a nursing mother who was pumping twice a day, she got hungrier than usual because of the additional calories lactating mothers expend.

73. Moreover, Defendants had no policy against taking leftover food.

74. Still, Ms. McCarthy hyper-scrutinized Ms. King.

75. For instance, when Ms. King used her own Tupperware to reduce paper waste, Ms. McCarthy demanded she use paper plates instead. Ms. McCarthy also scrutinized Ms. King for storing food in the refrigerator overnight.

76. The eating habits of male and non-lactating employees were not similarly scrutinized at General Atlantic.

77. Then, also on October 29, 2025, Ms. Armstrong emailed Ms. King about her performance.

78. She threatened Ms. King with a formal Performance Improvement Plan (PIP) unless her performance showed "immediate and sustained" improvement.

79. Ms. Armstrong also criticized Ms. King for leaving the office at 4:30 p.m. to pick up her son.

80.     Other employees at General Atlantic regularly left at 4:30, and often earlier, for personal appointments, and did not have it held against their performance.

81.     In response, on October 30, 2025, Ms. King requested an accommodation via a proposed modified schedule—she would work through her lunch hour and resume work from home each evening to ensure she completed a full workday.

82.     Ms. King also offered to discuss this further via phone or in person.

### 4.     General Atlantic Discriminatorily Lets Men Work Remotely but Fires Ms. King for Her Requests

83.     Ms. King expected Defendants to grant her accommodation request, as the team's male Director—who possessed the same numbers of years of experience as her—worked almost exclusively from home.

84.     This Director appeared in the office only twice during Ms. King's entire tenure.

85.     Meanwhile, Ms. King and the other eleven women on the team went into the office at least four times a week.

86.     The team's projects required constant and close collaboration with the Director.

87.     Yet, while all the women on the team participated in the weekly meetings from the office in person, the Director—the team's only man—joined the meetings remotely, with his camera off.

88.     But Defendants accommodated the Director's practice, while subjecting Ms. King's attendance and performance to higher levels of scrutiny.

89.     Ms. King held a similar role to the Director's.

90.     In particular, both roles were subject to the same rules and requirements about working in person.

91.     Both Ms. King and the Director reported to the same supervisor.

92.     Being on the same team, Ms. King and the Director shared the same coworkers.

93.     Like the Director, Ms. King was an individual contributor on the team, with no direct reports.

94.     Both the Director and Ms. King held equal weight in decision making on the projects they were assigned.

95.     Additionally, Ms. King's caregiver responsibilities mirrored—and exceeded—those of the Director.

96.     While both had two children, Ms. King had recently given birth and undergone surgery.

97.     Moreover, Ms. King's accommodation request was modest compared to the Director's arrangement.

98.     While the Director worked remotely full-time, Ms. King merely sought to work from home *beyond* standard work hours and offered to forfeit her lunch break daily to pick up her son from school.

99.     Accordingly, Ms. King reasonably believed that her accommodation request would at least be considered, if not accepted.

100.    But she was wrong.

101.    Within hours of Ms. King's accommodation request on October 30, 2025, Ms. McCarthy called a meeting.

102.    Unaware of what was to follow, prior to the meeting, Ms. King asked to discuss the New York State Paid Family Leave she was entitled to after the birth of her second child.

103.    But rather than discuss Ms. King's accommodation request, request for leave, or the pending schedule issues, **Ms. McCarthy fired her** in that meeting, effective December 31, 2025.

104.    On October 31, 2025, Ms. King again requested New York State Paid Family Leave.

14

105.    On November 1, 2025—three days after Ms. King's protected complaint regarding "wellness room" access and two days after her accommodation and NYS PFL request—Ms. McCarthy sent Ms. King a dishonest "Mutual" Separation Agreement.

106.    General Atlantic attempted to buy Ms. King's silence by offering her $10,000 to sign a Non-Disclosure Agreement. $10,000 was the same amount as Ms. King's promised performance bonus.

## CAUSES OF ACTION

### CAUSE OF ACTION 1
### Violation of the FLSA PUMP Act, 29 U.S.C. § 218d
### *(All Defendants)*

107.   Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

108.   The FLSA PUMP Act at 29 U.S.C. § 218d(a)(2), states that an "employer shall provide: . . . (2) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk."

109.   In violation of the PUMP Act, Defendants, throughout the relevant period, failed to provide Plaintiff a space to express breast milk that was free from intrusion from coworkers and the public.

110.   Defendants, through supervisors and management employees, failed to provide a "functional" space within which Plaintiff could express breast milk without the worry of being intruded upon, in violation of the FLSA.

111.   Defendants, through supervisors and management employees, failed to provide a place that was available to Plaintiff whenever she needed to express breast milk, in violation of the FLSA.

112.   Defendants, through supervisors and management employees, knowingly, willfully, and systematically engaged in this unlawful practice of refusing to provide sufficient lactation support to Plaintiff, in violation of the PUMP Act.

113.   Defendants violated Plaintiff's rights under the PUMP Act by failing to provide an appropriate place that is free from intrusion within which to pump breast milk.

114.   Defendants violated Plaintiff's rights by failing to institute policies and practices that comply with the PUMP Act.

115.    Defendants are liable to Plaintiff for legal and equitable relief in the form of damages and other relief, pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs, and expenses. *See* 29 U.S.C. § 216(b).

## CAUSE OF ACTION 2
### Retaliation in Violation of the FLSA, 29 U.S.C. § 215(a)(3)
#### *(All Defendants)*

116. Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

117. Under 29 U.S.C. § 215(a)(3) of the FLSA, it is illegal "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act…."

118. As a direct and proximate result of Plaintiff making a protected complaint regarding Defendants' failure to provide her access to a lactation room each time she needed to express breast milk that was free from intrusion from coworkers and the public, Defendants terminated her employment.

119. Defendants fired Plaintiff in direct response to Plaintiff's complaints about Defendants' failure to provide access to a lactation room free from intrusion from coworkers and the public each time she needed to express breast milk.

120. As a direct, foreseeable, and proximate result of the Defendants' retaliatory actions, Plaintiff has suffered additional damages, including lost wages and emotional distress.

121. The Defendants' failure to comply with 29 U.S.C. § 215(a)(3) entitles Plaintiff to recover her unpaid wages, interest, liquidated damages, reasonable attorney's fees, and the costs of this action.

## CAUSE OF ACTION 3
### Sexual, Pregnancy, and Familial Status Discrimination and Harassment
### in Violation of the NYSHRL
### *(All Defendants)*

122.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

123.    By the actions detailed above, among others, Defendants have discriminated against and harassed Plaintiff in violation of the NYSHRL, by, among others, denying her the equal terms and conditions of employment because of her sex, pregnancy, and familial status, specifically by failing to investigate her protected complaints, failing to provide adequate lactation accommodations, reprimanding her for biological necessities, and subjecting her to hyper-scrutiny regarding her needs as a nursing mother. Defendants also violated the NYSHRL by creating a hostile work environment and failing to accommodate Plaintiff's pregnancy.

124.    Defendants violated the NYSHRL by denying Plaintiff the same professional flexibility afforded to her male counterpart despite having similar responsibilities and experience. While Defendants permitted a male employee to remain physically absent, they penalized and ultimately fired Plaintiff for making a protected request for a far more modest remote-work accommodation to meet her needs as a caregiver.

125.    As a direct and proximate result of Defendants' unlawful actions in violation of NYSHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which she is entitled to an award of damages.

126.    Defendants' unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

19

## CAUSE OF ACTION 4
### Retaliation in Violation of the NYSHRL
### *(All Defendants)*

127.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

128.    By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including, most recently, terminating her employment.

129.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harm, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

130.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

131.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## CAUSE OF ACTION 5
### Failure to Accommodate
### in Violation of the NYSHRL
### *(All Defendants)*

132.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

133.    Under N.Y. Exec. Law § 296(3)(a), it is "unlawful discriminatory practice for an employer . . . to refuse to provide reasonable accommodations to . . . pregnancy-related conditions, of an employee . . .."

134.    Plaintiff requested reasonable accommodations in the form of access to a functional, private lactation space that was free from intrusion and available to be used as she needed, as well as a modified work schedule to account for her caretaker and lactation needs.

135.    Defendants refused to provide such reasonable accommodations. Instead, Defendants maintained a deficient "wellness room" that was frequently occupied by other employees—including men—for non-lactation purposes, lacked the necessary physical infrastructure for pumping, and subjected Plaintiff to physical pain while waiting to access the room.

136.    Defendants further refused to accommodate Plaintiff by admonishing her for pumping at her desk—a necessity created solely by Defendants' failure to provide a functional private space.

137.    Defendants have not demonstrated, and cannot demonstrate, that providing a functional lactation room or a modified schedule would have imposed an undue hardship on the conduct of General Atlantic's business.

138.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## CAUSE OF ACTION 6
### Aiding and Abetting in Violation of the NYSHRL
*(Defendants McCarthy, Armstrong, and Boone)*

139. Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

140. By the actions described above, Defendants knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

141. As a direct and proximate result of Defendants' unlawful actions in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harms, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

142. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of damages.

143. Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**CAUSE OF ACTION 7**
**Sexual, Pregnancy, and Caregiver Status Discrimination and Harassment**
**in Violation of NYCHRL**
*(All Defendants)*

144.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

145.    Under the NYCHRL, it is a violation to treat an employee less well than other employees because of their protected characteristics.

146.    By the actions detailed above, among others, Defendants have discriminated against and harassed Plaintiff in violation of the NYCHRL, by, among others, denying her the equal terms and conditions of employment because of her gender, sex, pregnancy status, and caregiver status, by failing to investigate her protected complaints, failing to provide a legally sufficient lactation room, failing to provide written notice of Plaintiff's right to be free from discrimination in relation to pregnancy, childbirth, and related medical conditions, failing to provide written notice about the provision of a lactation room, failing to distribute the above nonexistent written policy upon hiring, subjecting Plaintiff to a hostile work environment, and failing to accommodate Plaintiff's lactation needs.

147.    Defendants violated the NYCHRL by denying Plaintiff the same professional flexibility afforded to her male counterpart despite having similar responsibilities and experience. While Defendants permitted a male employee to remain physically absent, they penalized and ultimately fired Plaintiff for making a protected request for a far more modest remote-work accommodation to meet her needs as a caregiver.

148.    As a direct and proximate result of Defendants' unlawful actions in violation of NYCHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which she is entitled to an award of damages.

149.    Defendants' unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## CAUSE OF ACTION 8
### Retaliation in Violation of the NYCHRL
### *(All Defendants)*

150. Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

151. By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYCHRL, including, most recently, terminating her employment.

152. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harm, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

153. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

154. Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## CAUSE OF ACTION 9
### Failure to Accommodate a Pregnancy-Related Condition
### in Violation of the NYCHRL
### *(All Defendants)*

155.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

156.    Under the NYCHRL, N.Y.C. Admin. Code § 8-107(22), it is an unlawful discriminatory practice for an employer to fail to provide a reasonable accommodation to an employee for pregnancy, childbirth, or a related medical condition, including lactation.

157.    The NYCHRL specifically mandates that employers provide a lactation room that: is in reasonable proximity to such employee's work area. The NYCHRL also requires that the employer provide notice to other employees that if the room being used as a lactation room is used for other purposes, it must be given preference for use as a lactation room. The NYCHRL states that the presence of a lactation room shall not affect an individual's right to breastfeed in public.

158.    Defendants failed to provide a legally sufficient lactation room by forcing Plaintiff to go to the "wellness rooms" that were not on her office floor. Defendants violated the NYCHRL by failing to provide notice to other employees that the "Wellness Rooms" must be given preference for use as a lactation room. Defendants further violated the NYCHRL by explicitly reprimanding Plaintiff for pumping breastmilk at her desk.

159.    Defendants further violated the NYCHRL by failing to provide Plaintiff with a required written policy regarding the right to a lactation room and by implementing a restrictive reservation system that prioritized "prayer and other wellness needs" equally with or above the needs of nursing mothers.

160.    By failing to provide a space that met the specific statutory parameters, Defendants failed to provide a reasonable accommodation for Plaintiff's pregnancy-related condition.

161.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## CAUSE OF ACTION 10
### Aiding and Abetting in Violation of the NYCHRL
### *(Defendants McCarthy, Armstrong, and Boone)*

162.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

163.    By the actions described above, Defendants knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

164.    As a direct and proximate result of Defendants' unlawful actions in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harms, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

165.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of damages.

166.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## CAUSE OF ACTION 11
### Violations of New York Labor Law 215
### *(All Defendants)*

167.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

168.    During Plaintiff's employment, Defendants were subject to New York Labor Law § 215 *et seq.*

169.    Defendants violated NYLL 215 when they discharged, threatened, penalized, or in any other manner discriminated and retaliated against Plaintiff because she made a complaint to Defendants that Defendants engaged in conduct she, reasonably and in good faith, believed violated a provision of this chapter; because she exercised rights protected under this chapter; and because she used legally protected absences pursuant to federal, local, or state law.

170.    Defendants violated NYLL 215 by retaliating against her for her protected complaints, exercising her rights protected under NYLL 206-C, and for requesting protected Paid Family Leave.

171.    Defendants retaliated against Plaintiff because she made protected complaints to meet her lactation needs. Defendants did not provide Plaintiff with a legally sufficient lactation room and retaliated against her by labeling her activities as a source of discomfort when she was exercising her protected rights as nursing mother. Defendants failed to give notice to its employees that nursing employees must be given preference to access the multipurpose "wellness room" to express milk when needed.

172.    Defendants terminated Plaintiff shortly after she requested for her legally protected New York State Paid Family Leave.

173.    As a direct and proximate result of Defendants' unlawful policies and retaliation under NYLL 215, Plaintiff suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

174.    Plaintiff is also entitled to liquidated damages, front pay, lost compensation and damages, costs, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendants in an amount to be determined at trial for all available relief whether it be equitable, statutory, or economic.

## JURY DEMAND

Plaintiff demands a jury trial.

DATE: APRIL 17, 2026
NEW YORK, NY

SEPPINNI LAW, PLLC

/S/SHANE SEPPINNI
SHANE SEPPINNI
JOHN CRAIN
ISHA DOSHI (SDNY ADMISSION PENDING)

40 Broad St.
Floor 7
New York, NY
10004
(212) 859-5085
shane@seppinnilaw.com
john@seppinnilaw.com
isha@seppinnilaw.com